UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Case No. |
| | ) | 5:12-cr-65-JMH |
| v. | ) | |
| | ) | |
| PETRICA OCTAVIAN STOIAN, | ) | |
| NICHOLAS COREY GARNER, | ) | |
| SABRINA CARMICHAEL, | ) | |
| ELI HOLLEY, BROOKS SOWELL, | ) | |
| APRIL ABRAMS, DWAYNE HARDY, | ) | **MEMORANDUM OPINION & ORDER** |
| NATHANIEL GARNER, and HAROLD | ) | |
| SMITH, | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*

Defendants have entered guilty pleas in this matter, and the Court is tasked with imposing a sentence on them which is "sufficient, but not greater than necessary, to comply with" the purposes of sentencing set forth under 18 U.S.C. § 3553(a)(2). Setting out to accomplish this task, the Court starts with the understanding that the offense of conviction for each defendant in this matter for conspiracy to commit wire fraud carries a maximum sentence of

imprisonment of not more than 20 years. *See* 18 U.S.C. §§ 1343 and 1349. The Court is assisted in the sentencing errand by a correct determination of the advisory Guidelines, one element of which is the calculation of actual or intended loss attributable to each of the defendants for the fraud of which they stand convicted. U.S.S.G. § 2B1.1(b)(1).

Defendants dispute the amount of loss proposed in the presentence report prepared by the United States Probation Office. Thus, the matter is before the Court so that it may make a determination of the reasonably foreseeable loss which resulted from the offense conduct to which each defendant in this matter has entered a guilty plea and announce its rationale for that conclusion. This is no easy task in this case because the evidence shows that a substantial quantity of the evidence upon which the Court could ordinarily rely to make its calculation has been lost or destroyed or simply cannot be found as a result of the actions of the co-defendants. Nonetheless, the Court has made its quest for the legal Holy Grail of the loss amount

attributable to each defendant and has reached a sound conclusion based on the evidence and the law, as set forth below.

In making its determination, the Court has had the benefit of the parties' briefs [DE 498, 500, 501, 503, 504, 506, 507, 508, 509, 510, 515, 520, 521, 529, 546, and 553] as well as the evidence presented at a hearing which took place before this Court on December 8, 9, and 10, 2014, including the testimony of Special Agent Lowe, Detective Gavin Patrick of the Ashland Police Department, and Defendants' opinion witness, Dr. Arnold J. Stromberg of the University of Kentucky statistics department.

## I.

U.S.S.G. § 2B1.1(b)(1) provides that the Court shall increase the offense level for offenses involving fraud and deceit where the amount of actual or intended loss, whichever is greater, exceeds $5,000. *See* Comment 3(A). Actual loss is the reasonably foreseeable pecuniary ("monetary . . . readily measurable in money") or harm that resulted from the offense. Comment 3(A)(i) and (iii).

3

Intended loss is the pecuniary harm intended to result from the offense. Comment 3(A)(ii). To be reasonably foreseeable, a defendant must have known or, under the circumstances, reasonably should have known, that pecuniary harm was a potential result of the offense. Comment 3(A)(iv).

"The court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. 3(C); *United States v. Agbebiyi*, 575 F. App'x 624, 630-631 (6th Cir. 2014) ("Where losses are not easy to quantify, the court is only required to make a reasonable estimate of the loss, given available information, and such estimates need not be determined with precision."); *see also United States v. Gordon*, 495 F.3d 427, 431 (7th Cir. 2007) (holding that a district court "need only make a reasonable estimate of the loss, not one rendered with scientific precision"); *United States v. Triana*, 468 F.3d 308, 320 (6th Cir. 2006) (explaining that this precept rings true for "situations where the losses occasioned by financial frauds are not easy to quantify"). "The estimate of loss shall be based on available information, taking into account, as appropriate and practicable under the

4

circumstances" a number of factors such as "[t]he approximate number of victims multiplied by the average loss to each victim" and "[m]ore general factors, such as the scope and duration of the offense and revenues generated by similar operations." U.S.S.G. § 2B1.1 cmt. 3(C)(iv) and (vi); *United States v. Abdelsalam*, 311 F. App'x 832, 846 (6th Cir. 2009) (quoting U.S.S.G. § 2B1.1 cmt. 3).

It is permissible, for example, "to estimate the loss . . . by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown." *United States v. Tipton*, 269 F. App'x 551, 561 (6th Cir. 2008) (quoting *United States v. Bryant*, 128 F.3d 74, 76 (2d Cir. 1997)); *United States v. Mei*, 315 F.3d 788, 792-93 (7th Cir. 2003) (citing *United States v. Scott*, 250 F.3d 550, 552 (7th Cir. 2001); *United States v. Jarrett*, 133 F.3d 519, 530-31 (7th Cir. 1998); *United States v. Wai-Keung*, 115 F.3d 874, 877 (11th Cir. 1997); *United States v. Egemonye*, 62 F.3d 425, 428-29 (1st Cir. 1995); *United States v. Koenig*, 952 F.2d 267, 271 (9th Cir. 1991); U.S.S.G. § 2F1.1 cmt. 9)) (reviewing intended loss calculation in a counterfeit credit card scheme and remarking that courts and Sentencing Commission "have

approved averaging as a reasonable method of calculating intended loss in fraud cases).

The factors and facts upon which estimates are based must be proven by a preponderance of the evidence. *United States v. Poulsen*, 655 F.3d 492, 513 (6th Cir. 2011) (holding that if the loss amount is in dispute, the government must prove loss amount by a preponderance of the evidence, or the district court may engage in judicial fact-finding to determine the loss amount); *United States v. Bahhur*, 200 F.3d 917, 924-25 (6th Cir. 2005). It is permissible, for example, to extrapolate information about loss for one period and apply that information to another period. In *Tipton*, the Sixth Circuit approved of the extrapolation method of loss calculation, explaining that "requiring precise calculations which entail the gathering of documents that are diffuse and/or difficult to obtain would reward a defendant whose tax fraud was particularly complex

and/or spanned a significant period of time."[1] *Tipton*, 269 F. App'x at 561 (quoting *United States v. Spencer*, 178 F.3d 1365, 1368 (10th Cir. 1999)) (holding that district court's estimate of loss under U.S.S.G. § 2B1.1 was supported by the evidence where it relied upon testimony of inspector that she calculated profits generated from sale of unregistered pull-tab cards at a charity bingo location by multiplying the number of pull-tab cards played by the expected profit); *see also United States v. Wooten*, 39 Fed. App'x 83, 88 (6th Cir. 2002) (holding that district court properly estimated a $2.7 million loss due to fraud and money laundering by multiplying $9,000 by the number of days in the conspiracy even though there were only checks in an amount of less than $1 million mentioned during the trial where record contained testimony that defendants cashed a $9,000 check daily and purchased stolen goods with that amount until the funds were exhausted during duration of money laundering conspiracy).

---

[1] The *Tipton* court also rejected objections based on the small sample size and emphasized that the commentary to the Sentencing Guidelines provides that loss amounts "'shall be based upon *available* information,' and the sentencing court 'need make only a reasonable estimate of the loss.'" *United States v. Tipton*, 269 F. App'x 551, 561 (6th Cir. 2008) (quoting U.S.S.G. § 2B1.1 cmt. 3(C) (emphasis in *Tipton*)).

The United States urges the Court to estimate the loss in this matter by using the data from a known period – that attributable to $1,301,132.31 in verified transactions gleaned from a ledger found in the possession of Nicholas Corey Garner and Eli Holley at the time of their arrest in September 2011 – to craft an average daily loss. The ledger, a black notebook containing a series of handwritten notations which describe transactions, as well as other notes, listed transactions occurring from April 27, 2012, through September 11, 2012. Specifically, the United States urges the Court to divide the amount of verified transactions ($1,301,132.31) identified by Special Agent Lowe during his testimony -- by the number of days represented in the ledger (138) and then multiply that amount by the number of days of each defendant's participation in the conspiracy (including those dates outside of the period represented in the ledger) to yield a loss figure. The United States argues that "requiring a more precise calculation would reward the Defendants for engaging in wire fraud using numerous false identifications over a lengthy period of time." [DE 529 at 6, PAGE ID#: 3060.]

Defendants, however, object to the United States' proposed calculation of loss on two grounds: (1) that it requires the

8

Court to assume activity on the part of individual actors which is not in evidence, i.e., the transmission of funds from within the United States or the transmission of funds outside of the United States on days for which there has been no proof of particular transactions and to substitute that estimation of activity for the reasonable estimation of value or amount of intended loss based on actions know to have occurred and (2) that the government's proposal suggests that every act of every other conspirator was reasonably foreseeable to every other conspirator.

Looking at the defendant's first argument, the Court disagrees in large part. Defendants would have the Court conclude that the United States' suggested method of calculating loss would have it estimate the occurrence of illegal activity without proof of any such activity (from which loss might arise) outside of the period of the ledger. With respect to the first objection, the Court appreciates Defendants' concern and notes, first, the opinion of Dr. Arnold J. Stromberg who offers the Court the perspective of a statistician. He testified that the method of estimating loss proposed by the United States lacks statistical validity because, without external validation from known data points outside of the time period represented by the

ledger entries, the data within the ledger cannot be used to effectively predict behaviors outside of the time period.

The Court was not surprised by Dr. Stromberg's conclusion that one cannot use the data for a particular time period to predict that activity (criminal or otherwise) took place before or after the time period in which the data was collected. Nor does the Court find fault with his assessment that the United States' proposed method of calculating loss was not statistically sound without, at the very least, some external validation from the period about which predictions were to be made. Nonetheless, the Court concludes that there need not be a statistically valid estimation of the loss – only a "reasonable estimate" based on a preponderance of the evidence.

Part of Dr. Stromberg's criticism of the loss calculation from a statistician's perspective was that it was not random. Indeed, it could not be. It arose out of purposeful and directed activity undertaken by co-conspirators during that time period. However, it is equally clear from other testimony about loss provided by Special Agent Lowe (based on information only available after Dr. Stromberg's report was prepared) that $1.2 million in verifiable transactions attributable to the conspiracy charged in this matter occurred outside of the period

10

of time represented by the transactions contained in the ledger
and within the time frame of the conspiracy as charged in the
superseding indictment and of which the co-defendants stand
convicted.    Further, the evidence presented to the Court
revealed that it is nearly impossible to know the actual number
of transactions attributable to the conspiracy because
Defendants and their co-conspirators undertook to hide their
efforts by using an ever-changing series of aliases and
fraudulent identity cards which they routinely destroyed and
abandoned to make it difficult to follow their trail.
Ultimately, it is clear from the evidence to this Court that the
number of known transactions attributable to the conspiracy
grossly underrepresent the total number of transactions
undertaken by the co-conspirators.

This is distinct from the situation in *United States v.
Bryant*, 128 F.3d 74, 76 (2d Cir. 1997), in which the appellate
court held that "it is permissible for the sentencing court, in
calculating a defendant's offense level, to estimate the loss
resulting from his offenses by extrapolating the average amount
of loss from known data and apply that average to transactions
where the exact amount of loss is unknown."   In *Bryant,* the
evidence at trial showed that from 1991 to 1993, the defendant

ran an income-tax-refund "mill," preparing some tax returns in as little as three minutes, and routinely recording arbitrary deductions for his clients with no regard for actual expenditures. IRS files showed that Bryant prepared a total of 8,521 individual federal income tax returns for his clients, more than 99% of which resulted in refunds. When more than 20% of these returns were audited, the investigators found an average tax loss to the government of $2,651 per return, but the Court properly accepted the PSR's recommendation to use an estimated total loss of $600,000-an average of less than $100 per unaudited return, instead of the more than $2,400-per-return average revealed in audits-when evaluating the loss attributable to all the returns prepared, including nearly 7,000 unaudited returns, based on the average loss caused by the returns that had been audited. In *Bryant*, unlike the case before this Court, the defendant could not have completed his crime without creating a record of his filing under his own name with the IRS, making it possible to know with precision the number of instances in which fraud was even possible.

In many ways, this case is more like *United States v. Wooten*, 39 Fed. App'x 83, 88 (6th Cir. 2002) ("District courts may rely on estimates where those estimates are supported by the

preponderance of the evidence on record."), where there was evidence that defendants cashed a $9,000 check each day, even though each check was not introduced into evidence at trial, and used that amount to purchase goods, including stolen goods, until that amount was exhausted in furtherance of their money laundering scheme arising out of the sale of stolen airbags and other automobile parts. The court in *Wooten* distinguished the case before it from that in *United States v. Johnson*, 185 F.3d 765 (7th Cir. 1999), in which the appeals court rejected the district court's estimation of the quantity of money laundered (which consisted of averaging the amounts for three trips to estimate the amount carried on fourth trip) and warned that "'[n]ebulous eyeballing' is not enough." *Id.* at 768 (concluding that the lower court's method was flawed, since the trips were not a mathematical sample and the average load on three trips had no obvious link to the amount carried on a fourth trip).

The Court is troubled by the relative lack of data points outside of the time period described in the ledger but for slightly different reasons than Dr. Stromberg. This is because the Court is aware, as Dr. Stromberg admitted that he was not at the time of his analysis, that there is evidence of verifiable loss which occurred outside of the time period represented in

13

the ledger.   Agent Lowe testified to $1,023,385.70 in wire
transactions attributable to the conspiracy made from August 26,
2010, through the end of April, 2012 – a period of six hundred
fourteen days found outside of that time frame represented in
the ledger.   Lowe also identified 485 transactions totaling
around $1.4 million listed in emails sent from Nicholas Corey
Garner's email account ("damaya22@rocketmail.com") to "Rob," an
unindicted co-conspirator who used the email handle "John Ghoti"
and the address phone-book2011@hotmail.com, of which
approximately $210,000 has been verified by Western Union.   All
told, Agent Lowe identified and verified approximately $1.2
million in domestic transactions in the 614 day period
referenced above.   Further, Agent Lowe testified that none of
the wires that he could verify as sent from domestic co-
conspirators to foreign recipients, totaling $431,487.09, were
sent within the time period represented in the ledger.

      In other words, the Court is satisfied that a preponderance
of the evidence supports the conclusion that there were
verifiable losses attributable to the actions of co-conspirators
outside of the period described in the ledger.   Further, the
Court concludes that the evidence shows by preponderance that,
throughout the conspiracy, the co-conspirators were directly

14

responsible for the loss or secreting of potentially retrievable data which might have been used to calculate the amount of loss with far more precision. The evidence presented to the Court shows that both the defendants based in the United States and Defendant Stoian, who was located abroad during the relevant time period, used their real identities but also false identification documents which bore their images when communicating, transmitting, or receiving information or funds in this matter. The evidence shows that it is more likely than not that the co-conspirators worked together, domestically and overseas, to craft those documents. Several passport-style, head-shot photographs of Eli Holley, Nicholas Corey Garner, and Sabrina Carmichael, as well as other unknown individuals, were found in the data contained on a digital camera in the possession of April Abrams at the time of her and Dwayne Hardy's arrest by the Louisville Metro Police Department on August 24, 2011.[2] At least some of those photographs were also placed in evidence as images on fraudulent identification documents which included a number of aliases. Images of fraudulent identity

---

[2] The data on that camera also contained images of Nicholas Corey Garner, April Abrams, and Dwayne Hardy together in social situations, intermingled with some photographs of what appears to be photographs of the Cincinnati, Ohio, skyline taken from inside of a vehicle approaching that city.

documents were also located on a thumb drive seized from Nicholas Corey Garner upon his arrest in DeKalb County, Georgia. On a number of occasions, Customs agents seized a delivery of false identification documents as they arrived in the United States in packages sent to addresses in Kentucky and Ohio and bearing a foreign return address with an alias known to Agent Lowe to be used by co-defendant Stoian.   Within that package were documents bearing names used or to be used by the group.

Some of those fake identities and others correlated with known and identifiable individuals were largely discovered during the arrest of the various subjects in materials seized from their possession.  Finally, other names or identities used by participants were known because they were recorded in connection with transactions in the ledger seized at the arrest of Corey Garner and Eli Holley.  Had it not been for the discovery of that ledger, investigators would have been left to investigate and seek information about wired funds using only those identities represented on the documents found by arresting police departments.  Other fraudulent identification documents were found in the possession of Stoian at the time of his arrest or in an apartment associated with him; still others were used as he conducted the business of the conspiracy and even his own

16

personal affairs in Budapest, Hungary. Agent Lowe testified that the issue of fraudulent identity was compounded because he learned through the proffer of Sabrina Carmichael that once an identification document was used by a co-conspirator to conduct the business of the conspiracy in the United States between one and three times, it was destroyed.[3]

Agent Lowe used the ledger as the starting point for his calculation of loss. He explained on cross-examination that the ledger "is the only complete record that we have" in light of the co-defendants' efforts to hide their activity. Thus, the United States urges the Court to use that ledger like the Rosetta Stone, providing the Court with a concrete and verifiable example of the scope and amount of loss of which the conspiracy was capable over an identifiable period of time. The Court has, after much consideration determined that it will do so in light of the evidence which establishes that defendants were careful to hide their transactions, at least in part. In establishing a reasonable estimate of loss, the Court must rely on the available information, including the list of transactions

---

[3] Of interest, a large garbage bag of shredded paperwork was found in the trunk of the vehicle driven by Corey and Nathaniel Garner at the time of their arrest by the Brownsburg Police Department on January 9, 2012. *See* Government Exhibit 101. That vehicle was registered to co-Defendant April Abrams.

in the ledger which could be verified in large part, in an amount of $1,301,132.31 over the course of 138 days; that at least $1.2 million transactions plus more than $400,000 in wire transfers from the United States to accounts abroad could be verified outside of the period of time represented in the ledger; that the evidence shows that the co-defendants made every effort to cover their tracks using aliases and false identification documents which they then destroyed; and that Ricky Gibson, a member of the Gibson group, stated during his proffer that their cell was "doing" between $10,000 and $40,000 in "Western Union jobs" a day throughout the course of their conspiracy involving substantially similar if not identical activity from 2010 through October 15, 2012.

While the Defendants, during the examination of their expert suggested an alternative estimate of approximately $1,900 loss/day based on a daily average calculated from the $1.2 million in verifiable transactions found outside of the period represented by the ledger divided by the number of days outside of the ledger period, the Court concludes that calculation would grossly underestimate the amount of actual or intended loss attributable to the conspiracy. The Court sees a third alternative, adding together the verified transaction amounts

from the period represented in the ledger ($1,301,132.31) and the period of the conspiracy outside of that represented in the ledger ($1,233,385.70) and dividing them by the total number of days in the conspiracy and concludes that $3,370.37/day or $2,534,518.01 over the course of the 752 days of the conspiracy is a very reasonable estimate of loss attributable to the conspiracy based on the preponderance of the available evidence, particularly when individuals are also held responsible for the amount of money verified as wired abroad during their participation in the conspiracy as part of their loss.

The Court questions whether this represents the true extent of the loss considering what must be the number of transactions that were rendered irretrievable, by Defendants actions and concludes that it could well be an underestimation of the loss attributable to the conspiracy. Nonetheless, to the extent that the Court may wish to exercise lenity, the $3,370.37 daily average achieved using this calculation is consistent with the lower range of daily loss amounts seen at the beginning of the period described in the ledger (as well as with some frequency throughout that period) along a curve which peaks with the highest amounts in the middle of that period, a trend also observed by Dr. Stromberg.

19

Upon reflection, the Court's efforts sit somewhere between that in *Wooten* and that in *Johnson*, for the Court will use evidence of actual loss from verified transactions to account for activity over time during a period when there was evidence of additional conspiratorial activity, so as to ascribe it to the various defendants in a meaningful and reasonable estimation of loss. Ultimately, the Court concludes that $3,370.37 /day or $2,534,518.01 over the course of the 752 days of the conspiracy is a very reasonable estimate of the loss attributable to the conspiracy based on the preponderance of the available evidence.

## II.

Next, the Court considers what amount of loss may be assigned to each of the co-defendants. "[I]n the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" shall be included in determining the proper loss amount for purposes of U.S.S.G. § 2B1.1(b)(1). U.S.S.G. § 1B1.3(a). Accordingly, the Court first determines the "scope of the criminal activity the defendant agreed to jointly undertake" for each defendant.

20

*United States v. Aslan*, 644 F.3d 526, 552 (7th Cir. 2011). Next, the Court must determine "(1) whether the acts resulting in the loss were in furtherance of jointly undertaken criminal activity; and (2) whether those acts were reasonably foreseeable to the defendant in connection with that criminal activity." *Id.* at 536-37. "Foreseeability is not equivalent to actual knowledge. A defendant need not know of a co-schemer's actions for those actions reasonably to be foreseeable to the defendant." *Id.* at 537 (internal citation omitted).

In this instance, each of the defendants has entered into a guilty plea to the charges and agrees that he or she participated in a conspiracy in which money and property were obtained by "false and fraudulent sales of motor vehicles via the internet." Some members of the conspiracy created or distributed aliases and fraudulent identification documents to be used in the conspiracy; some co-conspirators created fictitious business names which were registered and incorporated using a residential address; some co-conspirators opened bank accounts for those fictitious businesses; some members listed motor vehicles for sale on legitimate websites using the fictitious business names. Some co-conspirators exchanged messages with potential buyers of the advertised vehicles and

21

arrange for the victim to wire money via a money transfer service. That money, once wired, was retrieved by members of the conspiracy using either their real names or aliases. The bank accounts that some of the co-conspirators created using business documents that they had obtained or forged were used to receive the proceeds, whether from wire transfers or by deposits of money and money and orders received from a money transfer service. Money from the accounts was then be wired to various foreign bank accounts, including those opened by Petrica Octavian Stoian, using either someone's real name or an alias. Money was then withdrawn from those accounts by co-conspirators abroad, including Stoian and Sorin Costea. Ultimately, the individuals who sought to purchase vehicles never received a vehicle in exchange for their money.

Stoian urges the Court to adopt the amount received in bank accounts that he set up using an alias and representing somewhere between 20 to 30 international funds transfers and an amount in excess of $400,000 but less than $1,000,000. Those transfers would include those received by Stoian from the other cells operating similar conspiracies all of which were operating within the United States, known to investigators as the Garner Group, the Gibson Group, and the Alex Group. To limit his

22

responsibility in such a way would, however, underappreciate the reach and nature of his involvement and awareness of the many activities of the co-conspirators.  Defendant Stoian has pleaded guilty to conspiring to commit wire fraud by defrauding victims of money sent for the purchase of automobiles advertised on on-line sales forums in the United States – automobiles which either did not exist or which were never intended to be delivered.  He conspired together with others to have those funds wire transferred from the United States to members of the conspiracy located abroad.  His co-defendants based in the United States were the individuals who worked to receive the funds from the defrauded "purchasers" and to have those funds wire transferred from the United States to foreign members of the conspiracy.  Special Agent Lowe explained that his investigation had revealed that false identity documents were forwarded to U.S. based co-conspirators using a name known to be an alias of Stoian, Nazarie Bogdan – for example, a package intercepted on October 26, 2011, sent from an address in Budapest to "Clayton Green" at 4300 Taylor Boulevard, Louisville, Kentucky, a location leased by Nicholas Corey Garner, as well as two packages intercepted in February and March 2012.  Agent Lowe also testified about three bank accounts

that Stoian had opened using the name Nazarie Bogdan.[4]   There is evidence that he used the alias Bogdan Nazarie, among others, to open at least three bank accounts in which were received funds wired from the Garner group and other cells operating in the United States.

The Court has also seen photographs which the Court concludes are images of Stoian based on his appearance which bear dates from November 2011 and February 2012 and from which the Court can and does conclude that he visited banks, on a number of occasions, alone or in the company of co-conspirator Sorin Costea.  Agent Lowe testified that Stoian's known aliases were used to open at least three bank accounts.  He further testified that investigators have correlated some of the images to an instance where co-conspirator Sorin Costea was withdrawing funds from an account associated with the conspiracy and at least one instance where Stoian was known to be opening an account at about the same time that the photograph was taken. There is sufficient evidence from which the Court can and does

---

[4] This address is separate and apart from the one associated with "Stoian's flat".  Also, notably, the package intercepted on February 12, 2012, mailed from Adrian Bolzan was on its way to Brooks Sowell in Fort Mitchell, Kentucky.   It contained four passports, one of which featured an image of Sabrina Carmichael and Brooks Sowell, as well as other individuals who remain unidentified.

conclude that Stoian was involved in establishing accounts or conducting transactions on behalf of the conspiracy.

He was also known to live in an apartment at which investigators discovered computer files and documents connected to the conspiracy – including fraudulent identification documents featuring Stoian's image and the name Petrut Ciobanu.[5] Photographs featuring Stoian, his girlfriend or partner, Mariana Florentina Gheorma, Sorin Costea, and a co-conspirator known to investigators as "Rob," among others, and dated December 31, 2011, January 1, 2012, and March 22, 2012, were found on electronic devices in that apartment. On the same electronic devices, in a folder titled "Petrica," investigators found images of automobiles, similar to those that might appear in an on-line advertisement for the sale of a vehicle, as well as

_____

[5] While Stoian's counsel objected to any reference to the apartment in Budapest as "Stoian's flat," he was clearly connected to it. Stoian's girlfriend or partner, Mariana Florentina Gheorma, told the Budapest police that Stoian lived there with his cousin. He was further connected to it by a woman who identified him as the individual who leased a parking space from her for his Mercedes automobile, with license plate MAN-307, using the name Nazarie Bogdan and who she understood to be a resident of that apartment. To the extent that Stoian objected to references to the Mercedes in question as "Stoian's Mercedes," the Court concludes that there is sufficient evidence to link him to that Mercedes (he had the key fob for it in his pocket at the time of arrest, there exist images of him in or near a Mercedes which was later pictured bearing the same license plate (MAN-307) as the vehicle for which the parking space was procured and which was connected to the key fob from his pocket, and – perhaps most damning—once he was arrested by foreign authorities, he directed that it be released to Gheorma). The apartment may have been inhabited by a number of people, but it was clearly somewhere that Stoian lived or visited on a regular basis during his time in Budapest.

templates for payment services available through Amazon and Google, templates for messages about vehicles for sale, and credit card information. Searches of the data contained by American investigators, including Detective Gavin Patrick, on the electronic devices discovered in that apartment revealed that they contained data which included the true names of and aliases used by some of the Garner group co-conspirators, business names used to establish fictitious businesses for the use of the co-conspirators, and the address 4300 Taylor Boulevard, Louisville, Kentucky. The Court can reasonably conclude from this evidence that he could foresee that someone among his co-conspirators (perhaps himself) would engage in the fraudulent advertisement of vehicles for sale in order to obtain the monies from victims of the fraud which could be picked up by individuals using their real names and aliases in the United States and, in turn, use businesses and accounts established in the United States to effect wire transfers to accounts abroad.

In other words, the Court concludes from a preponderance of the evidence that his involvement was not limited to receiving a few transactions, as he would have the court believe, and that he was aware of the many aspects of this conspiracy, including the types of activities undertaken by the co-conspirators based

26

in the United States in collecting the money and transferring it using their real identities and aliases. All of the loss which resulted from it was reasonably foreseeable to him, even if he did not know the day-to-day particulars. The Court, thus, rejects his argument that he cannot be held responsible for the wiring of funds from victims to domestic co-conspirators, only for the funds transferred from the United States to the overseas accounts that he created.

The United States argues that his participation began on August 26, 2010, once Nicholas Corey Garner became involved in the conspiracy even though he had already been engaged in similar activity with an earlier incarnation of the conspiracy as early as December 2009. No one disputes that his involvement concluded no earlier than his arrest in Budapest, Hungary, on March 29, 2012, for a total involvement of 582 days.[6] The United States has urged the Court to reduce that time by six weeks to reflect time that transfers were not possible, including bank holidays, the general holiday seasons surrounding Christmas, and other events. With that taken into account, the period of his

---

[6] Stoian argues that the government's evidence shows his first participation in June 2011, and fails to account for the time that he was in custody in Hungary for the last three months of the time period of the conspiracy. In fact, the number proposed at the loss hearing does account for the period that he was in custody.

27

involvement stretches 540 days. The Court multiplies the number of days by the daily average of $3,370.37 in loss then adds the bank wires associated with the Garner' group's activities as requested by the United States ($431,487.09) and concludes a reasonable estimate of the loss attributable to Petrica Octavian Stoian is $2,251,486.89.[7]

Nicholas Corey Garner was at the center of the activity in the United States. Special Agent Lowe testified that his involvement began with a Western Union transfer from the United States to a location overseas, either in Romania or Hungary, on August 26, 2010. He was eventually arrested, on September 15, 2012, near Indianapolis, Indiana, with his mother, Eli Holley, as they traveled home from Detroit, Michigan where they had contacted "Rob" by Skype. In the car with him and Holley were many items but, most damning, the black leather notebook which served as a ledger of transactions for the period leading up to their arrest. There is evidence that he communicated frequently with "Rob" via email throughout a substantial period of the conspiracy, although the two eventually had a falling out over money that "Rob" believed to have been taken by a member of

---

[7] The Court declines to include those amounts of wires and transfer service amounts from the United States to locations abroad attributable to the other similarly operated cells known as the Alex group and the Gibson group.

Garner's group.  As testified to by Agent Lowe and as the Court
can deduce from the contents of some of those communications,
Nicholas Corey Garner often received and provided to his
domestic co-conspirators information about opening accounts,
receiving and making transfers of funds, and the use of various
identifications.  Seized from his possession in DeKalb County
Georgia was a thumbdrive bearing images of fraudulent identity
documents for several of his co-conspirators. He was arrested or
stopped by police repeatedly in combination with other co-
conspirators (including Nathaniel Garner, Jelhani Williams,
Harold Smith, and others) in wide-ranging locations, from
Indiana to Tennessee to Georgia, and always, based upon the
evidence before the Court, in possession of fraudulent identity
documents and other materials associated with the conspiracy.

In other words, the Court cannot fathom a situation in
which he is responsible for none of the losses attributable to
the conspiracy, nor does the Court conclude that he is liable
solely for the amount of loss represented by the transactions in
the ledger, for the reasons stated elsewhere in this opinion.
Rather, the Court concludes that he is responsible for losses
for the time period in which he was involved in the conspiracy –
752 days less six weeks to reflect time that transfers were not

29

possible, including bank holidays, the general holiday seasons surrounding Christmas, and certain time he spent in jail, for a total of 710 days. The Court multiplies the number of days by the daily average of $3,370.37 in loss then adds the bank wires as requested by the United States ($431,487.09) and concludes a reasonable estimate of the loss attributable to Nicholas Corey Garner is $2,824,449.79.

The Court also rejects Defendant Eli Holley's argument that the Court should limit the amount of loss attributable to her to the $57,635 received at accounts (a lesser amount was wired abroad) that she concedes that she opened for "Y Finance" at Chase Bank and BB&T using the name Anna Dvorak on the theory that she created the accounts and made it possible for loss to occur by and through transactions related to those accounts. While she is directly responsible for that amount, the Court concludes that the other actual or intended loss during her period of involvement in this conspiracy was no less foreseeable to her.

Not only was she Nicholas Corey Garner's mother and not only did she use false identification to open the accounts described above, she began her involvement in this group by wiring money abroad for the conspiracy using her own name on

November 12, 2010, to Bucharest, Romania.  Her images were found on a number of fraudulent passports, including some seized by Customs as they entered the United States on September 30 and October 26, 2011, and her image was found on a number of electronic devices with images of other co-conspirators that were also used to produce false identification documents, including a camera in the possession of April Abrams and a thumbdrive seized from Nicholas Corey Garner during his arrest in Dekalb County Georgia on February 26, 2012.  Further, there was testimony from Agent Lowe that he learned that Holley participated in a Skype call with "Rob" while in Detroit, Michigan, on or about September 15, 2012, just prior to her arrest with her son as they traveled through Indianapolis, Indiana, in a vehicle filled with information about the conspiracy's then-latest transactions.  Ultimately, the Court concludes that her involvement in the conspiracy began on November 12, 2010, with the Western Union wires that she sent to Bucharest, and concluded with her arrest, alongside her son, Nicholas Corey Garner, outside of Indianapolis, Indiana, on September 15, 2012.

Her involvement with the conspiracy extends for 674 days, and the activity of her co-conspirators, by virtue of the nature

31

of her involvement and apparent understanding of the nature of the conspiracy, was foreseeable to her during that time period. The United States has urged the Court to reduce that time by six weeks to reflect time that transfers were not possible, including bank holidays, the general holiday seasons surrounding Christmas, and certain time that Nicholas Corey Garner spent in jail, for a total of 632 days. The Court multiplies the number of days by the daily average of $3,370.37 in loss then adds the bank wires as requested by the United Sttes ($431,487.09) and concludes a reasonable estimate of the loss attributable to Eli Holley is $2,561,560.93.

Similarly, the Court rejects Sabrina Carmichael's theory that she is responsible for only $593,318, for monies wired from accounts that she opened at various banks for Motors, LLC, using the alias "Valerie Pisano," to accounts abroad opened by "Adrian Florian" or "Adrian Flocea," an alias used by co-conspirator Sorin Costea.[8] The United States has presented evidence that she was involved from April 4, 2011, when she participated in a Western Union transaction, through September 15, 2012, when the conspiracy ended with Nicholas Corey Garner and Eli Holley's

---

[8] Money was also wired into that account by separate a separate cell of the larger conspiracy operating in the Orlando, Florida, area, and referred to by investigators as the "Gibson group."

arrest, for a total of 531 days.  During that time, her image appeared on a number of fraudulent identity documents seized as they entered the United States by Customs agents – on September 11, 2011, in a package sent from "Nazarie Bogdan" to "Clayton Green" at 4300 Taylor Boulevard in Louisville, Kentucky.  Her image also appeared on fraudulent identity documents with a number of different aliases and found on a laptop in Nicholas Corey Garner's possession at the time of his arrest in February 2012 in Dekalb County, Georgia.  Agent Lowe also learned from Brooks Sowell that, when Nicholas Corey Garner was away from the group at times, it was Sabrina Carmichael would manufacture fraudulent identifications, receive information from and communicate with "Rob," give out job instructions, and was in charge of the group.  She was with the group in Detroit in September 2012, immediately prior to the conclusion of the conspiracy with the arrest of Nicholas Corey Garner and Eli Holley near Indianapolis, when several members visited Detroit because Smith lived there.  She told investigators that she drove around with Smith during that time to various locations in an effort to cash money orders related to the conspiracy.

Applying the United States' estimate of six weeks off for dates and times when transactions were not occurring, she was

involved for 489 days.   This results in a loss amount of
$2,079,598.02, once the court multiplies the number of days by
the daily average of $3,370.37 in loss then adds the bank wires
as requested by the United States ($431,487.09).   The Court
concludes that $2,079,598.02 is a reasonable estimate of the
loss attributable to Sabrina Carmichael.

The Court also rejects April Abrams suggestion that she is
only responsible for those $11,757 wire transfers that she
concedes that she received using the names "Rebecca Brown,"
"Alexander Gray," "Nancy Smith," or "Iris Garver" in June and
August 2011 or the $39,200 in wire transfers to Romania that she
made in her own name during a 43 day period from November 23,
2010, through January 5, 2011.   Rather, the Court finds, by a
preponderance of the evidence that she was involved in the co-
conspiracy from the first wire transfer that she made in her own
name, on November 23, 2010, until her arrest by the Louisville
Metro Police while she attempted to complete a transaction on
August 24, 2011.[9]   During that period, she traveled with at least
her brother, Dwayne Hardy, and, if photos are to be believed,

_____

[9] Notably, there is also evidence that Abrams and Hardy were living with
Nicholas Corey Garner at 596 Rebecca Street in Atlanta, Georgia, well after
their arrest, and that Abrams traveled or planned to travel together with
Nicholas Corey Garner as late as August or September, 2012.   The Court does
concludes that, without more, this is not enough to tie Abrams to the actions
of the conspiracy after the date of her arrest in August 2011.

34

with her brother and her boyfriend, Nicholas Corey Garner as a camera in her possession was found to contain images of the three together prior to the date of her arrest. Also on that camera were "headshot" images of co-conspirators Eli Holley, Corey Garner, and Sabrina Carmichael, at least some of which were later found on fraudulent identity documents. Sabrina Carmichael told investigators that Abrams and Nicholas Corey Garner would drive through the night from wherever they were to Savannah, Georgia, to get her and return to the area where she had opened bank accounts so that she could initiate bank wires overseas once victims' money was placed in the account. This period stretches for 275 days. Giving her 3 weeks off during that period, as the United States suggests, results in a 254 day period of involvement. This results in a loss amount of $1,287,561.07, once the court multiplies the number of days by the daily average of $3,370.37 and then adds the bank wires as requested by the United States ($431,487.09). The Court concludes that $1,287,561.07 is a reasonable estimate of the loss attributable to April Abrams.

There is proof by a preponderance of the evidence that Dwayne Hardy became involved with the conspiracy on December 24, 2010, when he wired money overseas using his real name, and that

his involvement concluded with his arrest on August 24, 2011, in Louisville, Kentucky.    During his involvement, Hardy would eventually send thirteen such wires using his name. Investigators documented that he used the aliases "Louis Welmart" and "Jared Duckley" to receive money during the course of his involvement with the conspiracy.    He was arrested on August 24, 2011, with his sister by the Louisville Metro Police Department while she was inside a bank trying to wire money.    He had in his possession a fraudulent driver's license bearing the name John Thomas which bore his photograph.    He concedes that he intended to receive a wire transfer that day.    As to his knowledge of others involved in the group, he was featured in photographs taken from Abrams camera which show him with her then-boyfriend, Nicholas Corey Garner, at some time prior to August 24, 2011, in locations which appear to be near Cincinnati, Ohio.    Further, Sabrina Carmichael revealed to the investigators that Hardy had lived at 4300 Taylor Boulevard in Louisville, Kentucky, which investigators learned had been leased by Nicholas Corey Garner on June 15, 2011, but which the group had left before the end of August 2011.[10]

---

[10] There is evidence that he lived with his sister, April Abrams, and Nicholas Corey Garner at 376 Rebecca Street in Atlanta, Georgia, in February 2012.

In light of his extended involvement and travel with other members of the group, both over time and geography, as well as his apparent knowledge of the fact that he was involved in something well beyond the transactions that he completed, the Court rejects his suggestion that he be responsible for a mere $4,650, which accounts for the wire amount that he would have received using a fraudulent identification on August 24, 2011, had he not been arrested. The Court also rejects his suggestion that he be responsible for approximately $40,000 based on the thirteen documented transactions in which he participated which had a limit of approximately $3,000 each. Rather, the Court concludes that his period of his involvement encompasses 244 days, starting with the December 24, 2010, transaction and concluding with his arrest by the Louisville Metro Police on August 24, 2011. If he is afforded a period of three weeks "off" during that period, as the United States suggests he should be, then his total involvement extended over 223 days. This results in a loss amount of $751,592.51, once the court multiplies the number of days by the daily average of $3,370.37 in loss. The Court concludes that $751,592.51 is a reasonable estimate of the loss attributable to Dwayne Hardy.

37

Brooks Sowell's involvement began on October 22, 2011, with a Western Union transaction and concluded with his arrest on August 29, 2012, for a total period of 313 days. Several fraudulent identification documents with his image were found in a package seized by Customs on March 21, 2012. Sowell was eventually arrested in Louisville, Kentucky on May 16, 2012, again in possession of fraudulent identification documents. He was later stopped and gave permission to search his vehicle and hotel room to the police department in Woodlawn, Ohio, on June 8, 2012, where they found fraudulent identification documents some of which featured his photograph, including one for "David Bassett," and that of his girlfriend, as well as others. Also found were handwritten notes concerning banks, business information including an Ohio incorporation document for Platinum Auto Group, a handwritten note containing the tax identification number for Platinum Auto Group, mobile phone statements bearing one of his aliases which matched those which could be produced using a template found in an email exchange between Nicholas Corey Garner and "Rob;" and a printed document which provided instructions with respect to whom someone was to send money in the Czech Republic – not surprisingly the same name that was found as the return address on a package of

documents seized by Customs on June 6, 2012. Agent Lowe testified that investigators learned from Sabrina Carmichael that Sowell had opened a bank account in Ohio using his alias, "David Bass," which account was later referenced in an email exchange between Nicholas Corey Garner and "Rob." Investigators also learned from Sabrina Carmichael that Brooks Sowell had made "hundreds" of identification documents for the group and would correspond with "Rob" when Nicholas Corey Garner was gone, giving out instructions about when and where to obtain and send money.

Giving him a three week time "off," his involvement of 292 days results in a loss amount of $1,415,635.13, once the court multiplies the number of days by the daily average of $3,370.37 in loss then adds the bank wires as requested by the United States ($431,487.09).  The Court concludes that $1,415,635.13 is a reasonable estimate of the loss attributable to Brooks Sowell.

Nathaniel Garner's participation is the most limited of the group with respect to time.  There is a relatively limited time period for which there is proof of his involvement in the group. The Court concludes that he became involved in the conspiracy on December 3, 2011, at which time he participated in a Western Union transaction.  He again sent transactions on December 4, 6,

9, 11, 17, and 24, 2011, and on January 5 and 7, 2012.  He was arrested with his cousin, Nicholas Corey Garner, by the Brownsburg Police Department in Indiana on January 9, 2012, as Nicholas Corey Garner was attempting to open a bank account at a local bank using false identification.[11]  He was traveling, at that time, in a car owned or registered to April Abrams in which was found a large garbage bag filled with shredded documents, several fraudulent identity cards for a number of individuals, and various documents related to Golden Auto, including incorporation documents and a letter from a bank.  In his possession at the time of his arrest was a fraudulent Australian passport bearing the name "Wallace Steeves" and his photograph – the same name with which he opened a bank account on behalf of the conspiracy and through which $18,373.09 was transferred. The government argues that he was involved for 145 days, with one week off, for a total of 138 days of participation in the conspiracy.  Based on the evidence of his extensive periods of incarceration, however, the Court concludes that his participation began with the wire transfer on December 4, 2011, and concluded with his arrest on January 9, 2012, for a total of

---

[11] He was again in custody on February 9, 2012, in Georgia on other charges and remained in custody until the arrest of Nicholas Corey Garner and Eli Holley.

40

37 days.  The Court concludes that, based upon a preponderance of the evidence, this is an accurate measure of his involvement with the conspiracy.  The Court multiplies the number of days by the daily average of $3,370.37 in loss then adds the bank wires which took place during his involvement with the conspiracy as requested by the United States ($18,373.09) and concludes a reasonable estimate of the loss attributable to Nathaniel Garner is $143,076.78.

Harold Smith's involvement with the conspiracy began on November 14, 2011, and finally concluded with the end of the conspiracy and the arrest of Nicholas Corey Garner on September 15, 2012.  He argues that his involvement began on December 4, 2011, and was limited to his personal responsibility for seven transactions totaling $20,169 in which he transferred funds to Romania from Hardeeville, South Carolina between November 14, 2011, and December 4, 2011.  Nonetheless, he concedes that he was present in Jeffersonville, Indiana, with Nicholas Corey Garner and Jelhani Williams on May 18, 2012, when Williams was arrested when attempting to wire $2,900 from a Kroger store.  In August 2012, he telephoned Williams to advise that he had been working in the Toledo, Ohio area and that the group ultimately ended up in Detroit, Michigan, in September 2012 because Smith

41

lived there, according to Sabrina Carmichael, where she drove around with him to various locations in an effort to cash money orders related to the conspiracy. The government argues that he was involved for 307 days, with three weeks off, for a total of 265 days – the math is questionable, but the Court will give Smith the benefit of the doubt, assigning him 265 days of participation in the conspiracy instead of 286. The Court concludes that, based upon a preponderance of the evidence, this is an accurate measure of his involvement with the conspiracy. The Court multiplies the number of days by the daily average of $3,370.37 in loss then adds the bank wires as requested by the United States ($431,487.09) and concludes a reasonable estimate of the loss attributable to Harold Smith is $1,324,635.14.

For all of the reasons stated above, **IT IS SO ORDERED**.

This the 19th day of December, 2014.



Signed By:

_Joseph M. Hood_

Senior U.S. District Judge